**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
--------------------------------------------------------------- X

WILLIE JAMES LAFAYETTE, JERRELL       :
MCCLEVE, QUINCEY HARRIS, HASSON Q.    :
GALLOWAY, and TYRONE SANTIAGO, on     :     Civil Action No.
behalf of themselves and all similarly-situated   :
employees,                            :     **CLASS ACTION COMPLAINT**
                                      :
                    Plaintiff,        :     **Jury Trial Demanded**
                                      :
        v.                            :
                                      :
PRO CUSTOM SOLAR LLC d/b/a            :
MOMENTUM SOLAR,                       :
                                      :
                    Defendant.        :
--------------------------------------------------------------- X

Plaintiffs Willie James Lafayette, Jerrell McCleve, Quincey Harris, Hasson Q. Galloway and Tyrone Santiago, by and through their undersigned counsel, Wigdor LLP, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      In early 2019, Defendant Pro Custom Solar, LLC d/b/a Momentum Solar ("Momentum," "Momentum Solar" or the "Company") and its managers were accused of engaging in systemic discrimination against Black workers, fostering a racially-hostile work environment and retaliating against Black employees who filed discrimination complaints. These accusations resulted in the filing of a proposed class action lawsuit in Brooklyn, New York entitled *Murrell, et al. v. Pro Custom Solar LLC d/b/a Momentum Solar, et al.*, No. 19 Civ. 2656 (KAM)(CLP) (E.D.N.Y.) (the "Brooklyn Suit").[1]

---

[1]      *See* Patrick McGeehan, *It Seemed Like a Model Green Energy Firm. But Black Workers Paint a Different Picture*, New York Times, May 6, 2019, https://www.nytimes.com/2019/05/06/nyregion/momentum-solar-racial-discrimination-lawsuit.html.

2.      Among the allegations raised in the Brooklyn Suit was that Black employees were repeatedly referred to as "**Nigger**," and were abruptly terminated after they complained.[2]

3.      Then, in October 2019, a separate class action lawsuit, entitled *Venson, et al. v. Pro Custom Solar LLC d/b/a Momentum Solar, et al.*, No. 19 Civ. 19227 (ES) (MAH) (D.N.J.) (the "NJ Call Center Suit"), was filed accusing Momentum of subjecting their Black employees in its New Jersey headquarters' call center to vile, race-based harassment and discrimination.

4.      Among the allegations in the NJ Call Center Suit, once again, were that Black employees were repeatedly referred to as "**Nigger**" and maliciously retaliated against after complaining about discrimination.

5.      Adding insult to injury, Dave Wightman, a white regional service manager in Momentum's New Jersey headquarters, mocked the Black workers who came forward to make racial discrimination allegations by texting Black-skinned emojis and a GIF image of a group of white-hooded men – an obvious reference to the Ku Klux Klan – to another Momentum employee.  The blatantly racist text messages are displayed in the following screenshot:

---

[2]      The complaint filed in the Brooklyn Suit can be found here: http://www.wigdorlaw.com/wp-content/uploads/2019/05/Complaint-against-Momentum-Solar-Filed.pdf.



6.    Against the backdrop of such vile, racist attitudes held by members of its upper-most management, Momentum continues to thrive as one of the nation's most successful and fastest growing clean energy companies, and a top company in New Jersey across all industries, with aspirations of transforming into a publicly traded company.  In 2018, the state of New Jersey provided Momentum with a $7,200,000 tax credit, while in 2019, the investment firm Advantage Capital invested $4,100,000 in Momentum.

7.    As a result of the two previously filed lawsuits, Momentum's investors, clients and the New Jersey taxpayers who help foot its operations bill are likely aware that Momentum fosters a work environment permeated with vile racism that targets their Black employees. However, as additional employees come forward to share their experiences of being subjected to

harassment and hostility at Momentum, the pervasive and widespread nature of Momentum's discriminatory conduct becomes more evident.

8.      Similar to the degrading experiences of Black Momentum employees in Momentum's New York Field Offices and New Jersey Call Center, Black employees in Momentum's New Jersey Field Installation Departments have been subjected to a hostile work environment where many of them too were repeatedly referred to as **"Nigger."**

9.      To make their targeted discrimination more effective, Momentum has – in what appears to be shockingly reminiscent of segregation – divided employees into teams based upon their race.

10.      After segregating employees based upon race, Momentum awards the teams consisting of white and Latinx employees with better assignments – and in turn, opportunities for greater compensation – than its "Black teams."

11.      Momentum managers have also tolerated white employees engage in disgusting and racially-hostile conduct directed towards Black employees, including an incident in which a white employee had the audacity to suggest to a group of employees consisting of numerous Black employees that they should tie ropes like ***nooses***.  Even though numerous Black employees vocally objected to this demeaning rhetoric, while others could not tolerate what they were hearing and had to leave the meeting, the white employee in question was not even so much as given a slap on the wrist for his heinous and inciteful conduct.

12.      Additionally, upon information and belief, Momentum has provided its white employees greater starting compensation and, in some instances, raises that were approximately 300% higher than their equally qualified and experienced Black coworkers.

13. The unlawful discrimination and retaliation described herein was committed in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981") and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 *et seq.* ("NJLAD").

14. Accordingly, Plaintiffs bring this action on behalf of themselves and the members of the "Proposed Discrimination/Retaliation Class," as defined herein.

## JURISDICTION AND VENUE

15. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under § 1981. The Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a).

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

17. Plaintiff Willie James Lafayette is a Black adult male and resident of the State of Pennsylvania, residing in Philadelphia County. At all relevant times, Mr. Lafayette met the definition of "employee" and/or "eligible employee" under all applicable statutes.

18. Plaintiff Jerrell McCleve is a Black adult male and resident of the State of Pennsylvania, residing in Bucks County. At all relevant times, Mr. McCleve met the definition of "employee" and/or "eligible employee" under all applicable statutes.

19. Plaintiff Quincey Harris is a Black adult male and resident of the State of New Jersey, residing in Burlington County. At all relevant times, Mr. Quincey met the definition of "employee" and/or "eligible employee" under all applicable statutes.

20.     Plaintiff Hasson Q. Galloway is a Black adult male and resident of the State of New Jersey, residing in Camden County.  At all relevant times, Mr. Galloway met the definition of "employee" and/or "eligible employee" under all applicable statutes.

21.     Plaintiff Tyrone Santiago is a Black adult male and resident of the State of New Jersey, residing in Gloucester County.  At all relevant times, Mr. Santiago met the definition of "employee" and/or "eligible employee" under all applicable statutes.

22.     Defendant Pro Custom Solar LLC d/b/a Momentum Solar is a New Jersey limited liability company with its principal place of business located at 3096 Hamilton Boulevard, South Plainfield, New Jersey 07080.  At all relevant times, Momentum Solar met the definition of an "employer" under all applicable statutes.

## ADMINISTRATIVE PREREQUISITES

23.     Concurrent with the filing of the Complaint, Plaintiffs Quincey Harris, Hasson Q. Galloway and Willie James Lafayette will file a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  Upon issuance of a Notice of Right to Sue or other adjudication of the Charge, Plaintiffs shall amend their Complaint to assert claims under Title VII.

## FACTUAL ALLEGATIONS

**I.    Willie James Lafayette**

24.     Mr. Lafayette began working at Momentum as an Installer at its Cherry Hill, New Jersey, warehouse in or around Fall/Winter 2016.

25.     Mr. Lafayette identifies as a Black male.

6

26.     As a result of his training and experience, Mr. Lafayette was qualified for all positions he has held while employed by Momentum.

27.     In or around February 2017, Mr. Lafayette's supervisor, Dave Francis ("Francis"), praised his performance during a team meeting.  In doing so, Mr. Francis stated that he received "nothing but good reports" about Mr. Lafayette and joked that he "needed [Mr. Lafayette] to do something wrong" because "everyone only has good things to say."

28.     Upon information and belief, Daniel Mendoza ("Mendoza"), Mr. Lafayette's supervising foreman at the time, was present at the meeting and witnessed Mr. Francis praising Mr. Lafayette's performance.

29.     Upon information and belief, in or around March 2017, Mr. Francis was replaced by Bruce Scott.

30.     Upon information and belief, Bruce Scott is a white male.

31.     Upon information and belief, Mr. Francis is a Black male.

32.     Bruce Scott had the authority and ability to control and alter the terms and conditions of Mr. Lafayette's employment.

33.     Upon replacing Mr. Francis, Bruce Scott informed Mr. Lafayette that Bruce Scott "was in charge now."

34.     Shortly after becoming Mr. Lafayette's supervisor, Bruce Scott began targeting employees of color for termination.

35.     Upon information and belief, Bruce Scott terminated nine employees, eight of whom were employees of color.

36.     Mr. Lafayette was one of the employees of color that Bruce Scott terminated.

37.     In or around May 2017, Bruce Scott called Mr. Lafayette and another Black employee, Jerrell McCleve, into his office.[3]  Another supervisor, Yarek Kozlowski, was present in Bruce Scott's office during the meeting.

38.     Mr. Lafayette and Mr. McCleve were informed by Bruce Scott and Mr. Kozlowski that Momentum was "letting [them] go" due to "restructuring."

39.     In response, Mr. McCleve asked what they meant by "restructuring."  Neither Bruce Scott nor Mr. Kozlowski attempted to explain what they meant by "restructuring" or how the termination decisions were made.

40.     While in the meeting and upon coming to the realization that nearly all of the employees that Bruce Scott selected for termination were employees of color, Mr. Lafayette asked Bruce Scott and Mr. Kozlowski if he was being terminated because "[he is] Black."

41.     In response to Mr. Lafayette's question, Bruce Scott ominously grinned and appeared to chuckle.  Mr. Kozlowski cited to a single white employee that had been terminated as "proof" that race did not play a role in termination decisions.

42.     Mr. Kozlowski then instructed Mr. Lafayette and Mr. McCleve to leave the premises.

43.     Mr. Lafayette and Mr. McCleve complied with Mr. Kozlowski's request and immediately left the premises.

44.     Upon information and belief, later that day, Mr. Mendoza approached Mr. Kozlowski and protested Mr. Lafayette's termination, noting that it was unfair that Mr. Lafayette was fired.

---

[3]     Mr. McCleve is also a named plaintiff in this matter.

45.     In March 2018, Mr. Mendoza called Mr. Lafayette and offered him an opportunity to interview with the new manager at Momentum's Cherry Hill location, Kyle Scott.

46.     Upon information and belief, Kyle Scott is Bruce Scott's son and identifies as a white male.

47.     Shortly after receiving an offer to interview for a position at Momentum, Mr. Lafayette reported to Momentum's Cherry Hill location to interview with Kyle Scott.

48.     On the same day as his interview, Mr. Lafayette was informed that he was being rehired by Momentum.

49.     In or around the end of March 2018, Mr. Lafayette began his second period of employment by Momentum and has remained employed by Momentum since then.

50.     As he has the authority and ability to control and alter the terms and conditions of Mr. Lafayette's employment, Kyle Scott is Mr. Lafayette's supervisor.

51.     Upon returning to Momentum, Mr. Lafayette observed a work environment that continues to be plagued with unrestrained racial discrimination and harassment.

52.     On numerous occasions, Mr. Lafayette witnessed foreman David Palmer ("Palmer") bark commands at employees of color while referring to them as "**boy**."

53.     Mr. Palmer did not command white employees in a similarly harsh tone or refer to them as "boy."

54.     In or around 2018, while Mr. Lafayette's team – that consisted exclusively of employees of color – was preparing to leave the warehouse for a job site, they were approached by a foreman and informed that the client "did not want Black employees working at his home."

55.     Upon information and belief, in response to the client's discriminatory demands, Mr. Lafayette's team was removed from the job and the job was reassigned to a team that consisted of almost exclusively white employees.

56.     As such, Momentum altered the terms and conditions of Mr. Lafayette's and his Black team members' employment, as well as their compensation, based upon their race.

57.     Mr. Lafayette was incredibly shocked and offended by Momentum apparently conceding to a customer's discriminatory demands.

58.     In or around early 2019, Mr. Lafayette witnessed a foreman named Ross Oglesby ("Oglesby") joke about tying ropes "**like a noose**" while giving a group demonstration on how to tie up safety ropes (the "noose incident meeting").

59.     Due to Mr. Lafayette's knowledge of the historical use of nooses to perpetuate racial violence coupled with the tone of Mr. Oglesby's comments and the regularly occurring discriminatory "jokes" that took place in Momentum's workplace, Mr. Lafayette was immediately shocked and offended by Mr. Oglesby's statements.

60.     As such, Mr. Lafayette spoke up and stated out loud that Mr. Oglesby's remarks were inappropriate.  In doing so, it was clear that Mr. Lafayette was objecting to discriminatory conduct.

61.     Mr. Lafayette observed other Black employees also appear offended.

62.     In fact, numerous Black employees were so upset by Mr. Oglesby's comments that they walked out of the meeting.

63.     Upon information and belief, Kyle Scott was present at the meeting and heard Mr. Oglesby's noose comment and Mr. Lafayette's objections to Mr. Oglesby's comment, as well as witnessed numerous Black employees leave the meeting in outrage.

64. Upon information and belief, Kyle Scott ignored the concerns expressed about Mr. Oglesby's discriminatory statements.

65. As a result, Momentum signaled to Black employees that Momentum would not take complaints related to discriminatory remarks seriously.

66. Mr. Lafayette observed white employees receiving preferential treatment with respect to job assignments.

67. During numerous periods of Mr. Lafayette's employment at Momentum, in conduct that is reminiscent of racial segregation, Momentum divided employees into teams based upon their race.

68. Upon information and belief, Momentum assigns more preferable jobs to the predominantly white teams.

69. By way of example, Momentum provides teams consisting of white employees with bigger and/or easier job assignments that enable the teams to hit performance targets and, in turn, makes the teams more likely to receive bonus compensation.

70. Additionally, in or around the end of 2019, as a result of Mr. Lafayette hearing numerous employees discuss the amounts of their raises, Mr. Lafayette learned that white employees were awarded higher raises than Black employees.

71. Upon information and belief, white employees received raises that were approximately three hundred percent (300%) the size of the raises that were awarded to similarly qualified, experienced, senior, and well performing Black employees.

72. Upon information and belief, Momentum's segregation of employees into teams based upon their race continues to this day.

73.     Upon information and belief, in or around March 2020, due to reductions in workforce resulting from the COVID-19 pandemic, two teams were created.

74.     Mr. Lafayette was assigned to a team of all Black employees while, upon information and belief, the only other existing team consisted of white and Latinx employees.

75.     Upon information and belief, Mr. Palmer was the foreman of the crew that appeared to consist of exclusively white and Latinx employees.

76.     At one point, in or around summer/early fall 2020, Mr. Lafayette heard Mr. Palmer make remarks about trading two Latinx employees on his team in exchange for one white employee.  Mr. Palmer stated, "**I'd trade two of 'them' to have [white employee] back on my team**."

77.     While at Momentum, Mr. Lafayette witnessed Momentum apply leniency with respect to rule violations for white employees, while harshly disciplining Black employees for similar violations.

78.     By way of a general example, on numerous occasions, Mr. Lafayette witnessed Momentum apply harsh reprimands and discipline to Black employees who arrived to work late, while white employees received no reprimand for being similarly tardy.

79.     Additionally, by way example, Mr. Lafayette's coworker, Carlon Myers ("Myers"), who is Black, was suspended and demoted for being on a roof for a short period of time without a safety rope, while, upon information and belief, Mr. Oglesby, who is white, was caught in a similar situation and not suspended or demoted.

80.     The above account of Mr. Lafayette's experience at Momentum provides examples of some of the discriminatory hostility and mistreatment that he has faced while at Momentum and is not an exhaustive list.

## II.    Jerrell McCleve

81.    Mr. McCleve was hired as an electrical installer for Momentum in their Cherry Hill, New Jersey, warehouse in April 2016.

82.    Mr. McCleve identifies as a Black Male.

83.    Mr. McCleve was qualified for all roles that he held while employed by Momentum.

84.    Mr. McCleve's performance, during all relevant times, was exemplary.

85.    Like Mr. Lafayette, Mr. McCleve received praise from his first supervisor, Mr. Francis, who is Black.

86.    Unfortunately, also like Mr. Lafayette, as noted above, Mr. McCleve's employment was terminated by his subsequent supervisor, Bruce Scott, who is White, during Momentum's purging of employees of color in or around March 2017.

87.    As demonstrated by his termination of Mr. McCleve's employment, Bruce Scott had the authority and ability to control and alter the terms and conditions of Mr. McCleve's employment.

88.    In or around March 2018, Mr. McCleve was made aware of an opportunity to seek reemployment with Momentum by Mr. Mendoza.

89.    When inquiring about the opportunity with Mr. Kozlowski, Mr. McCleve was informed that he would be able to return to work at Momentum and be paid at his previous rate of pay.

90.    However, after interviewing and receiving a formal offer, Mr. McCleve learned that he was in fact only being offered to return at a lower pay rate.  After Mr. McCleve questioned this discrepancy, Kyle Scott informed him that this was the "best [he] could do."

13

91.     After learning more about the compensation of his white coworkers, Mr. McCleve realized that Momentum was awarding higher compensation to white employees, and that his pay was not in fact "the best" that Momentum "could do," but instead, the most they "would do" for a Black employee like himself.

92.     Kyle Scott was Mr. McCleve's supervisor and had the authority and ability to control and alter the terms and conditions of his employment.

93.     Upon his return to Momentum, Mr. McCleve found the work environment at Momentum to continue to be plagued with rampant discrimination toward Black employees.

94.     Mr. McCleve regularly heard white employees use racial slurs, such as "**nigger**," in the workplace.

95.     Mr. McCleve was shocked to witness that the racist conduct extended to supervisors as well.

96.     Mr. McCleve observed Mr. Palmer refer to Black employees with demeaning terminology, often calling them "**boy**."  Mr. Palmer never used this term when referring to white employees.

97.     Additionally, while never directed at himself, Mr. McCleve heard Mr. Palmer use the word "**nigger**" on numerous occasions.

98.     Mr. McCleve was even told by several other Black coworkers that Mr. Palmer used the slur "**nigger**" in the workplace, including an instance where Mr. Palmer referred to hip-hop as "**nigger music**."

99.     There was no question that, as a result of the regular use of racial slurs in the workplace, Kyle Scott was keenly aware that racially discriminatory terminology, phrases, and references were rampant in the workplace at Momentum.

100.    In fact, as noted above, Kyle Scott was present at the noose incident meeting, where foreman Mr. Oglesby, made discriminatory references to tying a rope "**like a noose**."

101.    Mr. McCleve was also at the noose incident meeting and felt incredibly offended by Mr. Oglesby's "noose" comments.

102.    Mr. McCleve also witnessed his Black coworkers express outrage at Mr. Oglesby's comments.

103.    Mr. McCleve was shocked to see Kyle Scott implicitly endorse Mr. Oglesby's comments by standing by and doing nothing while Black employees objected to the discriminatory reference.

104.    On numerous occasions throughout his employment, Mr. McCleve learned of white employees receiving greater compensation than their equally (or more) qualified and experienced Black coworkers.

105.    After learning of the pay differential between Black and white employees, Mr. McCleve asked Kyle Scott for a raise.

106.    Additionally, Mr. McCleve asked to be paid more because Kyle Scott required him to drive one of the Company's box trucks to job sites – a role that Mr. McCleve believed generally entailed higher compensation and required additional certifications.

107.    Upon information and belief, Mr. McCleve's white coworkers that were required to drive Momentum's box trucks received higher compensation.

108.    On one particular occasion, in or around Fall 2019, Mr. McCleve pointed out to Kyle Scott that Mr. McCleve was not Department of Transportation ("DOT") certified – a certification that Mr. McCleve believed was required, at least under Company practice, for driving box trucks – and thus, should not be tasked with driving one of these trucks.

109.    After objecting to driving the box truck and once again requesting fair compensation that aligned with the compensation received by his white coworkers, Mr. McCleve retaliatorily received a two-day suspension without pay.

110.    As Kyle Scott's suspension of Mr. McCleve was made, in part, in response to Mr. McCleve requesting comparable pay as his white coworkers, Kyle Scott's actions constitute unlawful retaliation.

111.    Additionally, the severity of Mr. McCleve's punishment stands as yet another example of how Black employees have received harsher punishments than their white coworkers who have committed equal or more severe purported infractions.

112.    In response to Mr. McCleve's request for higher compensation, Kyle Scott responded that Mr. McCleve could not receive a raise while remaining in his current position but could only earn more pay through a promotion.

113.    This made Mr. McCleve feel hopeless, as Mr. McCleve witnessed Momentum favor white employees for promotions over their more senior, experienced, and qualified Black coworkers.

114.    In or around October 2019, after it became clear that the discriminatory environment at Momentum was deeply rooted, systemic, and unlikely to change, and that it was an environment that was no longer tolerable, Mr. McCleve was constructively discharged from his role at Momentum.  Notably, while Mr. McCleve reported that his last day would be November 1, 2019, due to the emotional distress that he was experiencing, his final day reporting to work at Momentum turned out to be October 24, 2019.

115.     The above account of Mr. McCleve's experience at Momentum provides examples of just some of the discriminatory hostility and mistreatment that he has faced while at Momentum and is not exhaustive.

**III.    Quincey Harris**

116.     Mr. Harris was hired as an electrician by Momentum in its Cherry Hill, New Jersey, warehouse in approximately January 2019 and is currently still employed by Momentum.

117.     Mr. Harris identifies as a Black Male.

118.     As a result of Mr. Harris' exemplary performance, he was promoted to a Lead Electrician in February 2020.

119.     Due to his training and experience, Mr. Harris was qualified for all positions he has held while employed by Momentum.

120.     Upon first starting at Momentum, Mr. Harris was briefly placed on Mr. Palmer's team.

121.     As foreman, Mr. Palmer was Mr. Harris's supervisor and had the authority and ability to control and alter the terms and conditions of Mr. Harris's employment.

122.     Additionally, Kyle Scott, who was an install manager at the Cherry Hill location, had the authority and ability to control and alter the terms and conditions of Mr. Harris's employment.

123.     While on Mr. Palmer's team, Mr. Harris was subjected to racially-hostile treatment from Mr. Palmer.

124.     Mr. Palmer would regularly refer to Mr. Harris in a degrading tone and demean him by calling him "**boy**" – a term that Mr. Palmer did not use when referring to white members of the team.

125.    In or around March 2018, Mr. Harris was moved to a different team, but quickly learned that the discriminatory conduct at Momentum was widespread.

126.    Mr. Harris witnessed white employees regularly make racist "jokes" and use racist terminology at Momentum.

127.    In fact, Mr. Harris was also present at the noose incident meeting in early 2019.

128.    Due to the widespread and open nature of employees making racially discriminatory statements, supervisors, including Kyle Scott, were unquestionably on notice of the discriminatory and hostile environment at Momentum.

129.    Racist "jokes" and terminology have been commonplace at Momentum and have occurred throughout Mr. Harris's employment at Momentum.

130.    In or around the end of 2019, Mr. Harris learned that Black employees were not receiving the same pay raises as their white coworkers.

131.    Through discussions with numerous employees, Mr. Harris learned that, on average, white employees received up to three hundred (300%) higher raises than their Black coworkers.

132.    Mr. Harris received no raise at all during this pay adjustment cycle.

133.    Additionally, through numerous conversations with coworkers, Mr. Harris learned that his starting pay was less than both previously and subsequently hired similarly-situated white employees.

134.    Upon information and belief, other Black employees also started at a lower pay rate than their similarly-situated white coworkers.

135.    Upon information and belief, Momentum engages in a practice of discriminatorily considering an employee's race when making decisions regarding compensation, raises, and promotions.

136.    In or around the spring 2020, Mr. Harris was placed back on Mr. Palmer's team.

137.    Shortly thereafter, while at a job site, Mr. Palmer instructed Mr. Harris to turn off the "**hip-hop shit**" that he was listening to because it was "**not for people in this neighborhood**."

138.    Additionally, Mr. Palmer, once again, proceeded to make Mr. Harris a target of his discriminatory conduct.

139.    Mr. Palmer regularly demeaned Mr. Harris and directed profanity at him, such as referring to Mr. Harris as an "**asshole**" and "**bitch**."

140.    Notably, Mr. Palmer did not treat Mr. Harris' coworkers that were not Black in the same hostile manner.

141.    During one instance, in or around Summer 2020, Mr. Palmer referred to Mr. Harris as "boy" and shouted profanity at him.

142.    At least one other employee at Momentum witnessed this incident.

143.    On the same day, Mr. Harris reported Mr. Palmer's discriminatory outbursts to Kyle Scott and, in doing so, Mr. Harris specifically stated that Mr. Palmer's mistreatment of him was a product of Mr. Palmer's racist beliefs.

144.    In response, upon information and belief, Kyle Scott did not reprimand Mr. Palmer but, instead, moved Mr. Harris to another team.

145.    Mr. Palmer's racial animus is so widely known to employees of Momentum that it is commonly and openly discussed by Momentum's employees.

146.    At numerous times during his employment, Mr. Harris has been placed on teams that were segregated based upon race.

147.    Mr. Harris observed Momentum engage in the same practice with other employees.

148.    After segregating employees into teams based upon their race, supervisors and other Momentum employees would often assign race-based labels to the teams.  For example, teams were referred to as the "Spanish team," "white team," and "Black team."

149.    Momentum also engaged in a pattern of utilizing their practice of segregation to "get rid of" employees that the Company wanted to terminate.

150.    In doing so, Momentum would regularly place one employee of a particular race on a team comprised solely of members from another race in order to make the one employee feel uncomfortable and isolated.  This was done with the hope that the isolated employee would ultimately quit.

151.    In or around the end of 2019, Mr. Harris heard Kyle Scott remark that Momentum wanted to "avoid paying unemployment," and thus wanted to create an environment that "pushed out" the employees that Momentum wanted to "get rid of."

152.    As noted above, a discriminatory application of disciplinary policies and practices was one method that Momentum used to intentionally create a hostile work environment for their Black employees.

153.    By way of an additional example, in or around the end of 2019, a white employee was permitted to remain employed after being caught stealing from Momentum.

154.    Meanwhile, Black employees have received harsher punishments, such as demotions, for much less severe rule violations.

155.    In a recent incident occurring in December 2020, one of Mr. Harris' white coworkers, Jamie (last-name unknown), threatened Mr. Harris and repeatedly referred to him as a "**nigger**."

156.    Another one of Mr. Harris' team members witnessed this incident.

157.    Mr. Harris, as well as Jamie and the witness, all told Kyle Scott about this incident.

158.    Upon information and belief, the witness confirmed to Kyle Scott that the altercation was caused by Jamie and mentioned Jamie's use of racial slurs.

159.    Nevertheless, Kyle Scott reprimanded Mr. Harris by placing him on a suspension for several days.

160.    Upon information and belief, the perpetrator, Jamie, received the same punishment as Mr. Harris, and was permitted to remain employed at Momentum.

161.    The punishment meted out by Kyle Scott against Mr. Harris for engaging in protected activity constituted unlawful retaliation.

162.    The above account of Mr. Harris' experience at Momentum provides examples of just some of the discriminatory hostility and mistreatment that he has faced while at Momentum, and is not an exhaustive list.

## IV.    Hasson Q. Galloway

163.    Mr. Galloway was hired as an installer for Momentum in its Cherry Hill, New Jersey warehouse in approximately January 2018, and is currently still employed by Momentum.

164.    Mr. Galloway identifies as a Black male.

165.    As a result of his training and experience, Mr. Galloway was qualified for all positions he has held while employed by Momentum.

166.    As a result of Mr. Galloway's exemplary performance, he was promoted to foreman in or around June 2018.

167.    Upon information and belief, Kyle Scott has been Mr. Galloway's supervisor at all relevant times during Mr. Galloway's employment with Momentum.

168.    Mr. Galloway has been subjected to a racially-hostile work environment where he has witnessed white employees be permitted to use the racial slur "**nigger**," assigned better projects, and awarded greater compensation than their equally (or more) qualified and experienced Black coworkers.

169.    Through numerous conversations with other coworkers, Mr. Galloway has learned that a white foreman, that he is just as qualified and experienced as, receives significantly greater compensation than he does.

170.    Upon information and belief, Momentum intentionally awards white employees higher compensation than their equally experienced, qualified, and senior Black coworkers.

171.    Mr. Galloway has witnessed Momentum's pattern and practice of segregating employees into teams based upon their race.

172.    By way of example, Mr. Galloway witnessed another foreman, named David Palmer, appear to intentionally remove Black employees from his team so that he could have a predominantly white crew.[4]

173.    In fact, it was commonly expressed through word of mouth that Mr. Palmer intentionally removed Black employees from his team as a result of their race.

---

[4]    Upon information and belief, Mr. Palmer still has a predominantly white crew with no Black employees and one Latinx employee.

174.    Mr. Galloway is another one of the Black employees who was present during the early 2019 noose incident meeting.

175.    Mr. Galloway was offended by the discriminatory comments and witnessed other Black employees object to the comments.

176.    Mr. Galloway also witnessed other white employees of Momentum be permitted to use the racial slur "**nigger**."

177.    Due to the regular and blatant use of racial slurs in the workplace, Mr. Galloway's supervisors, including Kyle Scott, have unquestionably been aware that employees at Momentum use discriminatory language in the workplace, yet have done nothing about this.

178.    Like the other Plaintiff's, Mr. Galloway has received less compensation than similarly-situated white coworkers.

179.    With the hope of standing against the severely and persistently racially-hostile environment at Momentum, Mr. Galloway has joined this action.

180.    The above account of Mr. Galloway's experience at Momentum provides examples of just some of the discriminatory hostility and mistreatment that he has faced while at Momentum and is not an exhaustive list.

## V.    Tyrone Santiago

181.    Tyrone Santiago was hired as an installer for Momentum in its Cherry Hill, New Jersey warehouse in approximately May 2016.

182.    Mr. Santiago identifies as a Black male.

183.    As a result of his training and experience, Mr. Santiago was qualified for all positions he has held while employed by Momentum.

184.    Mr. Santiago was subjected to a racially discriminatory environment where white employees regularly used the racial slur "**nigger**," were assigned to more desirable projects as compared to Black employees and were paid greater compensation than their equally (or more) qualified and experienced Black coworkers.

185.    By way of example, one day in or around Winter of 2017, Mr. Santiago was working on a roof with his white foreman, Mr. Oglesby.  Mr. Santiago recommended to Mr. Oglesby a method to properly frame the roof.  In response, Mr. Oglesby replied, "**do not tell me what to do you fucking nigger.  I can't stand niggers.**"

186.    Mr. Oglesby's remarks were incredibly offensive to Mr. Santiago and made him feel unsafe, degraded, and humiliated.

187.    Immediately following Mr. Oglesby's discriminatory slurs, Mr. Santiago reported the statements to manager Kyle Scott.

188.    Kyle Scott responded by promising to speak with Oglesby.

189.    Upon information and belief, no formal investigation occurred as a result of Mr. Santiago's complaint.[5]

190.    In fact, upon information and belief, Momentum completely failed to discipline Mr. Oglesby at all – essentially endorsing his reference to Mr. Santiago as a "fucking nigger."

191.    Instead, in response to Mr. Santiago's complaint of discrimination, both Mr. Oglesby and Kyle Scott began a campaign of retaliation against him.

192.    For instance, after Mr. Santiago reported the discrimination, both Mr. Oglesby and Kyle Scott suddenly began to falsely criticize his work performance and verbally berate Mr. Santiago.

---

[5]    Unsurprisingly, Kyle Scott and Mr. Oglesby are close friends.

193.    Additionally, throughout his employment at Momentum, Mr. Santiago witnessed Momentum apply leniency with respect to mistakes made by white installers, who were rarely, if ever, reprimanded.  In contrast, Momentum managers would immediately fire Black installers for similar or less severe mistakes.

194.    Likewise, Mr. Santiago witnessed white installers show up late for work without rebuke.  In comparison, Black installers would receive harsh beratement for similar actions.

195.    In fact, as observed by the other Plaintiffs herein, Mr. Santiago witnessed Momentum divide its employees into installer crews based on the employees' race.

196.    Mr. Santiago's crew consisted solely of employees of color – who were supervised by a white foreman.

197.    On a daily basis, Momentum permitted white foremen to degrade and demean Black installers.

198.    Black installers like Mr. Santiago were essentially "groomed" and "trained" to fear white foremen and silently accept the hostility and discriminatory animus they would direct towards them.

199.    Furthermore, Mr. Santiago's hourly compensation was less than that of his white installer peers, and he was denied any opportunity for meaningful professional growth.

200.     For instance, after working at Momentum for a year, Mr. Santiago was consistently denied raises, while similarly experienced, qualified, and performing white employees receive raises.

201.    In or around May 2017, after his first year at Momentum, Mr. Santiago addressed the discriminatory compensation differentials with Kyle Scott in person, but he refused to remedy Mr. Santiago's concerns.

202.    Upon information and belief, for example, a white installer named Chris (last-name unknown) – who had less experience than Mr. Santiago – was awarded a $2 raise and received higher compensation than Mr. Santiago.

203.    Indeed, Mr. Santiago received a starting compensation of $16 per hour, while numerous white installers – without experience – received starting compensation of $19 per hour.

204.    In or around March 2019, unable to endure continued exposure to Momentum's hostile, discriminatory, and retaliatory work environment, Mr. Santiago left the Company.

## VI.    Racial Discrimination, Harassment and Retaliation Against Other Black Momentum Employees

205.    Plaintiffs are also aware of discriminatory actions against other similarly-situated Black employees at Momentum's New Jersey locations.

206.    For instance, Plaintiffs are aware of other Black employees receiving less pay than their similarly-situated non-Black coworkers.

207.    Plaintiffs are also aware that other Black employees were adversely impacted by Momentum's preferential treatment of white employees with respect to job assignments.

208.    Plaintiffs are also aware of other Black employees who were subjected to a racially-hostile work environment in which they were routinely confronted with racial slurs.

209.    Plaintiffs are further aware of other Black employees who were retaliated against in response to their objections to Momentum's discriminatory conduct and practices.

210.    In addition, Plaintiffs are aware of how other Black employees have been segregated into teams based upon their race.

211.    Moreover, Plaintiffs are aware of other Black employees who were adversely impacted by Momentum's discriminatory application of the disciplinary policies and practices to employees based upon their race.

212.    By way of a specific example, Plaintiffs are aware of another Black employee that was subjected to severe racial hostility.

213.    In the presence of this employee, in or around Summer 2019, Mr. Palmer told another employee that was playing hip-hop music to "**turn that nigger music off**."

214.    On another occasion, in or around Fall/Winter 2019, Mr. Palmer took a wire, shaped it into a whip, and gestured as if he were whipping a Black employee.  While doing this, Mr. Palmer made a reference to slave labor.

215.    On multiple occasions, a white employee that witnessed the above discriminatory conduct made complaints to Kyle Scott about Palmer's inappropriate behavior, but nothing was done to address these concerns.

## <u>CLASS ALLEGATIONS</u>
### (§ 1981 and the NJLAD)

I.    <u>Class Definition</u>

57.    This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23, brought by Plaintiffs on behalf of a "Proposed Discrimination/Retaliation Class" of similarly-situated employees.  The Proposed Discrimination/Retaliation Class (subject to future revision as may be necessary) is defined as follows:

> **All Black Field Installation Department employees who worked for Momentum out of its New Jersey warehouses during the full statutory period, including, but not limited to, Installers, electricians, Roof Leads and foremen**

58.    In order to be a member of the Proposed Discrimination/Retaliation Class, an individual must have been or be included within the scope of the class definition at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Proposed Discrimination/Retaliation Class Period").

59.    The unlawful conduct suffered by Plaintiffs and the members of the Proposed Discrimination/Retaliation Class, includes, but is not limited to:

- Subjecting Plaintiffs and the Proposed Discrimination/Retaliation Class to repeated highly offensive and patently racist comments.

- Subjecting Plaintiffs and the Proposed Discrimination/Retaliation Class to other acts of racial hostility and discrimination, including, *inter alia*,

   o    demeaning, belittling and insulting Plaintiffs and the Proposed Discrimination/Retaliation Class;

   o    refusing to communicate with Plaintiffs and the Proposed Discrimination/Retaliation Class;

   o    ostracizing Plaintiffs and the Proposed Discrimination/Retaliation Class;

   o    assigning Plaintiffs and the Proposed Discrimination/Retaliation Class to less preferential jobs while providing white employees with better work and opportunities for advancement; and

   o    assigning the Plaintiffs and the Proposed Discrimination/Retaliation Class to unfavorable job sites and work assignments.

- Failing to promote qualified members of the Proposed Discrimination/Retaliation Class, including Plaintiffs.

- Paying Plaintiffs and the Proposed Discrimination/Retaliation Class less than similarly-situated white employees.

- Failing to prevent, address, properly investigate, and/or take remedial action regarding discrimination committed against Plaintiffs and the Proposed Discrimination/Retaliation Class.

- • Retaliating against employees who report or complain about Defendant's discriminatory conduct, including, but not limited to, by terminating their employment.

60. The Proposed Discrimination/Retaliation Class contains at least 40 members during the applicable limitations period.

61. Plaintiffs and the Proposed Discrimination/Retaliation Class have standing to seek the relief sought herein because of the adverse effects that Defendant's unlawful patterns, practices and/or policies have had on them individually and generally.

62. The patterns, practices and/or policies described in this Complaint demonstrate that discrimination and retaliation are not unusual at Momentum; rather, they are part and parcel to its standard operating patterns, practices and/or policies.

## II.    <u>Numerosity and Impracticality of Joinder</u>

63. The members of the Proposed Discrimination/Retaliation Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Discrimination/Retaliation Class members is unknown because such information is in the exclusive control of Momentum, upon information and belief there more than 40 current and former employees who have been victims of the discriminatory and retaliatory conduct and adverse employment actions described herein.

64. Although precise determination of the number of Proposed Discrimination/Retaliation Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    <u>Common Questions of Law and Fact</u>

65. The claims alleged on behalf of Plaintiffs and the Proposed Discrimination/Retaliation Class raise questions of law and fact common to Plaintiffs and

Proposed Discrimination/Retaliation Class members.  Chief among these questions are as follows:

- Whether Plaintiffs and the Proposed Discrimination/Retaliation Class were subjected to repeated and highly offensive and patently racist comments.

- Whether Plaintiffs and the Proposed Discrimination/Retaliation Class were subjected to other acts of racial hostility and discrimination, including, *inter alia*,

  - demeaning, belittling, and insulting Plaintiffs and the Proposed Discrimination/Retaliation Class;

  - refusing to communicate with Plaintiffs and the Proposed Discrimination/Retaliation Class;

  - ostracizing Plaintiffs and the Proposed Discrimination/Retaliation Class;

  - assigning Plaintiffs and the Proposed Discrimination/Retaliation Class to menial jobs while providing white employees with sophisticated work and opportunities for advancement; and

  - assigning Plaintiffs and the Proposed Discrimination/Retaliation Class to unfavorable job sites and work assignments.

- Whether Defendant failed to promote qualified members of the Proposed Discrimination/Retaliation Class, including Plaintiffs.

- Whether Defendant paid Plaintiffs and the Proposed Discrimination/Retaliation Class less than similarly-situated white employees.

- Whether Defendant failed to prevent, address, properly investigate, and/or take remedial action regarding discrimination committed against Plaintiffs and the Proposed Discrimination/Retaliation Class.

- Whether Defendant retaliated against employees who report or complain about Defendant's discriminatory conduct, including, but not limited to, by terminating their employment.

66.    Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.    **Typicality of Claims and Relief Sought**

67.    Plaintiffs are a member of the Proposed Discrimination/Retaliation Class they seek to represent.

68.    The claims of Plaintiffs are typical of the claims of the Proposed Discrimination/Retaliation Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendant and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal and state law.

69.    Plaintiffs and the members of the Proposed Discrimination/Retaliation Class all allege that they each were the victim of unlawful adverse employment decisions and/or a hostile work environment based on race and/or color and/or in retaliation for complaints regarding unlawful discrimination.

70.    The relief that Plaintiffs seeks for Defendant's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Discrimination/Retaliation Class.

71.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    **Adequacy of Representation**

72.    The interests of Plaintiffs are co-extensive with those of the Proposed Discrimination/Retaliation Class he seeks to represent in the instant case.

73.    Plaintiffs are willing and able to represent the Proposed Discrimination/Retaliation Class fairly and vigorously as they pursues their similar individual claims.

74.    Plaintiffs have retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

75.    The combined interests, experience and resources of Plaintiffs and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    **Requirements of Rule 23(b)**

### A.    **Rule 23(b)(1)**

76.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

77.    Specifically, all evidence of Defendant's patterns, practices and/or policies and the issue of whether they are in violation of federal, state and local law would be exchanged and litigated repeatedly.

78.    Accordingly, certification of the Proposed Discrimination/Retaliation Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Proposed Discrimination/Retaliation Class and Defendant.

79.    By filing this Complaint, Plaintiffs are preserving the rights of Proposed Discrimination/Retaliation Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**B.**    **Rule 23(b)(2)**

80.    Defendant has acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed Discrimination/Retaliation Class, by adopting and following systemic patterns, practices and/or policies that are discriminatory and retaliatory towards Plaintiffs and the members of the Proposed Discrimination/Retaliation Class.

81.    These discriminatory and retaliatory acts are fostered by Defendant's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Proposed Discrimination/Retaliation Class as a whole.

82.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on Plaintiffs' and the members of the Proposed Discrimination/Retaliation Class' race and/or color and/or engagement in protected activity.

83.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the Proposed Discrimination/Retaliation Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination and retaliation.

84.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**C.**    **Rule 23(b)(3)**

85.    The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed Discrimination/Retaliation Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

86.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the Proposed Discrimination/Retaliation Class.

87.     The cost of proving Defendant's pattern and practice of discrimination makes it impracticable for the members of the Proposed Discrimination/Retaliation Class to pursue their claims individually.

88.     The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed Discrimination/Retaliation Class, as well as the common questions of law and fact described above.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of § 1981)**

89.     Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

90.     As described above, Defendant has discriminated against Plaintiffs and the Proposed Discrimination/Retaliation Class on the basis of race and/or color in violation of § 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment and disparate treatment based on race and/or color.

91.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

92.     Defendant's unlawful discriminatory actions constitute malicious, willful and wanton violations of § 1981 for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of § 1981)

93.     Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

94.     As described above, Defendant has retaliated against Plaintiffs and the Proposed Discrimination/Retaliation Class for engaging in protected activity, including, *inter alia*, by altering the terms and conditions of their employment and terminating their employment.

95.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of § 1981, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

96.     Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of § 1981 for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NJLAD)

97.     Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

98.     As described above, Defendant has discriminated against Plaintiffs and the Proposed Discrimination/Retaliation Class on the basis of race and/or color in violation of the NJLAD by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment and disparate treatment based on race and/or color.

99.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NJLAD, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

100.     Defendant's unlawful discriminatory actions constitute malicious, willful and wanton violations of the NJLAD for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NJLAD)**

101.     Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

102.     As described above, Defendant has retaliated against Plaintiffs and the Proposed Discrimination/Retaliation Class for engaging in protected activity, including, *inter alia*, by altering the terms and conditions of their employment and terminating their employment.

103.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NJLAD, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

104.    Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of the NJLAD for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, prays that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.    Certification of the case as a class action maintainable under FRCP 23, on behalf of the Proposed Discrimination/Retaliation Class;

B.    Designation of Plaintiffs as representative of the Proposed Discrimination/Retaliation Class;

C.    Designation of Plaintiffs' counsel of record as class counsel for the Proposed Discrimination/Retaliation Class;

D.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State of New Jersey;

E.    An injunction and order permanently restraining Defendant and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

F.    An order directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect the lives of Plaintiffs and the Proposed Discrimination/Retaliation Class;

G.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the Proposed Discrimination/Retaliation Class for all monetary and/or economic damages;

H.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the Proposed Discrimination/Retaliation Class for all non-monetary and/or compensatory damages;

I.      An award of punitive damages;

J.      Pre- and post-judgment interest on all amounts due;

K.      An award of costs that Plaintiffs and the Proposed Discrimination/Retaliation Class incur in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

L.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages.

Dated: July 22, 2021
      New York, New York                   Respectfully Submitted,

**WIGDOR LLP**

By: _____
          Tanvir H. Rahman
          Michael J. Willemin
          (*pro hac vice* admission pending)

85 Fifth Avenue
New York, New York 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
trahman@wigdorlaw.com
mwillemin@wigdorlaw.com

*Counsel for Plaintiffs and Proposed Counsel for the Proposed Discrimination/Retaliation Class*